All righty. We will now hear United States v. Bryan Singer. Do we have counsel on the line? Mr. Trochino? Good morning, Your Honor. Craig Trochino on behalf of the appellant, Mr. Singer. I'll be reserving five minutes for rebuttal. Thank you, Mr. Trochino. Thank you. Mr. Singer was convicted of attempted smuggling items into Cuba, and the government's proof was insufficient in two regards for this conviction. First, the government failed to prove that Mr. Singer had the intent to take items, and second, the government failed to prove that a substantial step toward the attempt was committed. I'm going to first focus on the failure to prove intent. Just last year, the United States Supreme Court in Rehoff stated that we, quote, we normally presume that Congress did not intend to impose criminal liability on persons who, due to lack of knowledge, did not have a wrongful mental state. In that regard, the Supreme Court has held consistently that in certain circumstances, ignorance can indeed be a defense. And the Rehoff Court stated that that's the case when the defendant, quote, has a mistaken impression concerning the legal effect of some collateral matter, and that mistake results in his misunderstanding of the full significance of his conduct, thereby negating an element of the defense. What happened here is Mr. Singer was bringing multiple and various items from Florida to Cuba. They included motorcycle parts, DirecTV boxes, telephones, microwave ovens, diapers. All of those, when one takes things to Cuba, there are licenses and there are licensing exceptions. There's a licensing exception to take things to Cuba to support the Cuban people. That's a designated reason under the administrative rules. Some things need a license. Of all the items on Ms. Yesenia's... Is there a question? No. This is Jill Pryor. I just have a question about how this works. To receive an exception, do you actually have to apply for a license? If the item requires a license, you have to apply for the license. If the item does not require a license and you're traveling under a licensing exception, i.e., to support the Cuban people, then you do not need to apply for one. So the items on Mr. Singer's boat, all of them did not need a license with the exception of these things called nanostations. They're internet routers. Mr. Churchill, this is Robin Rosenbaum. I agree with you that there has to be knowledge of the violation and there has to be knowledge that he needed some kind of a license to take these items to Cuba. But why isn't the evidence that was produced at trial, when viewed in the light most favorable to the verdict, which we must do, sufficient to establish that he knew? When we look at the fact that he hid these 303 nanostations in the compartment under the bed and the bed was screwed down on top of it, and then, according to Agent Blythe, who, again, we have to look at the evidence in the light most favorable to the your client both, well, I guess he asked him at least twice if he had anything else to declare. He denied having anything to declare. And then he told Mr. Blythe, after finding, after Mr. Blythe found the nanostations, that he was sorry he had lied to the agent, but that he didn't want them to find the nanostations. Why isn't that enough to establish, at least circumstantially enough to support the verdict, that he had knowledge that he wasn't allowed to take these items to Cuba without a license? Two reasons, Your Honor. First, there were other items underneath that bed other than the nanostations, including the TP-Link modems, which did not require a license. That's true. But what difference does that make? What difference might have known that, might have just failed to disclose it because he didn't feel like it, or that he, well, I guess if he disclosed that there were these other items, he'd have to open up the bed and show them to the agents, and then the nanostations would be discovered. So I'm not sure how that works in the light most favorable to the verdict in favor of your client. Like I said, there's two reasons. The first reason is not everything underneath the bed was subject to a licensing requirement. There were other items under the bed, so there's no point in hiding anything that's legal from the United States government. Mr. Singer's testimony was that... But let me interrupt for a second. But if he had no place else to store it, and he just stored it under there because that's where it was convenient, and he didn't advise about the items that were legal that were under the bed, because he knew that once he advised about it, he'd have to open it up and show it, and they'd find the nanostations. Why isn't that the inference that would be reasonable for the jury to take? I guess, why does it matter that there were other items that were legal that were stored under there? Because the question is his knowledge of the items. His testimony was that he secured them under the bed because he was hiding them from the Cuban government, who would have put him in jail in Cuba. And there's been support for that. Not terribly long ago, the United States had a prisoner swap for someone who was doing essentially the same thing that Mr. Singer was convicted of. I understand what you're saying, and I know that he said that. I acknowledge that he testified to that, and certainly it would have been totally fair for the jury to have believed him on that and acquitted him on that basis. But it did not, and it apparently chose to believe Agent Blythe's testimony that he told Agent Blythe that he was sorry that he lied about the bed being screwed down because of the Cuban authorities, but he really screwed it down and hid the stuff under there because he didn't want the American authorities to find it. I mean, we have to credit that when we look at the verdict here under the standard of review. So given that, why isn't that evidence enough to support the because there were other items that did not require a licensing exception in that same location? Had the nanostations not been under the bed, we're not having this particular discussion because everything in the boat was legal. The only thing that made it, the only thing that made the nanostations illegal is the distance over which they transmit. There is no evidence whatsoever that Mr. Singer knew that the nanostations possessed that characteristic of the distance of transmission. But here's the problem. In that regard, if the nanostations hadn't been under the bed, perhaps the reason we wouldn't be here is because at that point, either the bed wouldn't have been screwed down or if it was screwed down, there would have been no reason for your client to say not to declare what was under the bed. I mean, there's a reason for him not to declare the legal stuff under the bed because he knows that the agents are going to then want to see that. And once they open that up and see the legal items under the bed, they're going to see the nanostations, which are illegal. So I don't, I'm not understanding how that helps your client. Maybe I'm missing something. I'm asking you to understand that. Oh, and I'll do my best to help your honor understand that underneath the bed. There were direct, there were direct TV boxes. Okay. There were direct TV boxes. There were TP link modems, all legal. If the nanostations on another side of the boat, then he's still hiding things underneath the bed, which gives more I agree with your honor that maybe Mr. Singer was a little hard headed in his dealing with agent Blythe and he's got a conviction for false statement to the agent, which I'm not challenging because he admitted to that in his testimony, but being a hard head does not make someone a criminal. If it did, there's a vast majority of Congress who might have a little bit of a problem, but being, being hard headed does not mean that the government proved like was necessary in the Staples case that he was aware of and knew of that characteristic that made these nanostations illegal. Mr. Cuccino, what, what about the fact that your client was certainly aware of these regulations and spent some time researching these regulations? That certainly seems to be a factor that could go against him because understanding that there are these regulations in place, if you don't get an answer and you proceed anyway I mean, can't that go against your client? I understand your honor's question. And the evidence actually is from Tina Corb that he was never informed about the, the export administration regulations, the expert, the expert testimony from everybody involved. I don't think there's any other way to describe these, these regulations other than Byzantine. There is a declaration that communications equipment are, are, are, are encouraged to be brought to Cuba. This device is a communication device. The only thing that makes it a problem is the distance over which it was, it was the distance over which it broadcasts its range. I see my, my, my time is now up. Mr. Cuccino, before you forget, Mr. Cuccino, this is Jill Pryor. I have a question for you. I thought that there was testimony by one of the government's witnesses that one of the reasons the nanostations were listed as classified was that, was the speed at which they transmitted data, that it was more than 10 megabits per second. And here, and here, well, let me, let me just finish. Here, Mr. Singer loaded the boxes onto his boat and on the box it indicated that their speed was up to 150 plus megabytes, megabits per second, which was over the 10 that the government witness testified. What do you make of that evidence? I, I, I don't, that's not my recollection of the, of the declaration of all the expert witnesses. They, there are two things that made the nanostation on the list of, of licensing requirements. Number one was its encryption. And number two was the distance over which it transmitted. I don't believe there was any, my recollection of the record, your honor, is that there wasn't a discussion of the speed at which it transmits. Michael Pender, the, one of the government witnesses said the box says, the box says nothing about the distance or encryption on it. Alan Christensen testified that modems and network access controllers are allowed to be exported to Cuba. The TP-Link modems were okay, but the nanostation wasn't because of the distance. Agent Blythe was confused over these things because he originally thought the DirecTV boxes weren't allowed. He confiscated them, gave them back to Mr. Singer saying, quote, they're good to go. Then incorrectly testified in front of the grand jury that they were, needed a license, which they do not. Okay. I'm aware of your, I understand your argument in that regard. One more question. Certainly. When, when Mr. Singer was interviewed by Agent Korb, he lied specifically about the nanostation saying they were for the use of the passengers on the boat. What do you, does that evidence impact your argument at all? Um, I, Mr. Singer's declarations and his testimony and everything he filled out with the, with the Coast Guard was that his entire purpose was going there was to support the Cuban people. I don't. But with respect to your argument that all of these, he could have thought that, that the status of the nanostations was the same as these other communications devices. But there, there was evidence at trial that he lied specifically about the nanostations in his interview. And he's, he was convicted of that, of lying to the agent. And he admitted to that in his, which, which I, that charge is different than the attempted exportation charge. So that, so his statement to Tina Korb is encompassed in a conviction that's going to stand because it wasn't challenged. You know, there was no really argument against it at trial. And I can't challenge it now. The challenge I'm making is against the attempted exportation one. And, uh, I, I, I'm, I'm well beyond time. So I'm happy to continue answering the court's questions, but otherwise maybe I should, um, save the rest of my time. All right. Thank you very much. We appreciate it. Mr. Trachino. We'll hear from Mr. Maskin. Good morning, Your Honors. May it please the court, Dan Maskin on behalf of the United States. Government amply proved in the jury rightly concluded that Mr. Singer knew that his attempted exportation was contrary to law or regulation. This court should reject his invitation to import into section 554A, a heightened mens rea burden that the text of the statute doesn't support and should affirm his conviction and sentence. Unless Your Honors would prefer otherwise, I'll begin with a discussion of mens rea in particular. And I'd like to address the line of Supreme court cases on which Mr. Singer chiefly relies, because in our view, the contrast between those cases and this case goes a long way to explaining why his argument fails. If there could be said to be a, an overriding concern at the heart of the Supreme Court's mens rea case law over the last half century or so, that concern would be ensuring that statutes don't sweep up innocent conduct. That's true. When we think about Staples, when we think about Bryan, and most recently, when we think about Rahafe. And Staples is really a case in point because there the Supreme Court was confronted with a statute, the National Firearms Act, that included no mens rea provision whatsoever. And the only way the Supreme Court could interpret that statute without sweeping up innocent and in that case, constitutionally protected conduct was to import mens rea into the statute specifically, knowingly, knowing conduct. Here we are dealing with a case in a statute that fall on the opposite end of the mens rea because here the district court specifically instructed the jury that it could only convict Mr. Singer if it concluded that he knew that his attempted exportation was contrary to law. And so the concerns about statutes covering innocent conduct that lie at the heart of the Supreme Court's recent mens rea jurisprudence simply don't exist in this case. I'm happy to address any other questions that your honors have in the time remaining to me. If there are none, we ask that your honors affirm the district court... Hello, sorry. Oh, I'm sorry. I think I was on mute. This is Jill Pryor. I do have a question for you. Sorry about that. When we're applying the test from Setforth and Staples and Liparata, can we look at the language of section 554 in the context here of exporting goods to Cuba and the unique rules that apply there? Or do we look at the statute divorced from that context? Because Mr. Singer's argument here is that he didn't know the capabilities of the nanostations that made them illegal under those statutes and regulations. Right. So the short answer, your honor, is the latter. And two circuits, the fifth in Cardenas and the ninth in Rivera, both of which we rely on in our briefs, have concluded as much and have held that the government doesn't need to prove specific intent to violate whatever the underlying statute or regulation is. It just needs to prove knowingly under section 554A. If there are no further questions, we ask that your honors affirm the district court. And thank you very much for your time. Thank you, counsel. Mr. Trocino-Rabata. Thank you, your honor. With regard to the administrative regulations, the United States Supreme Court has said that where administrative regulations deal with items not generally known to the public to be controlled by the government, the government has to prove that the person actually knew and intended to violate that particular section. But we've discussed the intent part quite significantly. I'd like to move to the substantial step on the attempt. The evidence seems to be clear on the record below that the was canceled. I'm sorry, Mr. Trocino. Well, generally, you can't argue something in rebuttal that you didn't bring up in your initial argument. I know you said you were going to do it, but you didn't get to it. I guess what I'll do is- I apologize, your honor. That's okay. I did speak for a while in your section. What I'm going to do, though, to make it fair, I'm going to give you two minutes to address the argument. I'm going to give Mr. Mask in one minute, and then I'll give you another minute. All right? I appreciate that very much. I'll be as brief as absolutely possible. The record evidence was quite clear that the trip was canceled. Agent Blythe said the trip was canceled. When he arrived on May 1st, there were many people on board, many things on board. When he arrived on May 2nd, there was nobody else on board other than Mr. Singer, and most everything was taken off. There was no movement on the boat. It was still moored in the same place it was. Mere preparation is not sufficient for attempt. It requires a substantial step, and our view is that substantial step would have actually been unmooring the boat and beginning the journey. That didn't happen in this case. Back to the original point, there's two reasons that the government's proof was insufficient. One, on the intent, and two, on the substantial step with the attempt. I appreciate the court's indulgence in letting me get to that particular point. Unless the court has a question on that, I'll leave it at that. Thank you, Mr. Turchino. Mr. Maskin, let me give you one minute to address just the new issue that I allowed Mr. Turchino to bring up. Thank you, Your Honor. So, this court has said that what distinguishes a substantial step from mere preparation is that a substantial step strongly corroborates the firmness of a defendant's criminal intent. And in the smuggling context, it's hard to think of too many things that more strongly demonstrate the firmness of criminal intent than concealing hundreds of nanostations under a bed so securely that it takes a power tool to locate them. And on top of that, lying to law enforcement afterwards about their very existence. All right, thank you, Mr. Maskin. Thank you, Your Honor. Mr. Turchino, you have one minute just to address that one issue that Mr. Maskin addressed, if you wish. When the boat is in the United States, there is nothing illegal about possessing the nanostations. I can have one delivered here tomorrow by Amazon. The only thing that makes them illegal is heading to Cuba, which he never did. All right, thank you very much. And I would ask the court to reverse. All right, thank you, counsel. We will take the case under advisement.